ALEXANDER C. BULLITT vs. ANDREW MUSGRAVE.—*June Term*, 1845.

*B* authorized *G* to purchase certain personal property of *M*, put up by him on a fishery of *B's*; in case they could not agree, to call in a third person, as to the price; and whatever they agreed, he, *B*, would pay, but said, "recollect that when my claim for damages and rent is settled, whatever remains I will pay it." This was communicated to *M*, who said, "I am perfectly satisfied to leave it to men, but I have done *B* no damage; I owe him some rent, which I have been always ready to pay him." Arbitrators were selected, who awarded, that *M* should "receive the sum of $1000 for the following property, to wit: The houses, sheds, with all the apparatus thereto affixed with nails; also all loose plank over, &c.," and repairs on *Stony Point Shore*, with repairs on wagon house. On this award *G* and *M* endorsed, "we do agree to abide by the within appraisement."

In an action to recover the amount of the award, *B* offered evidence that the claim thereon was compromised, and released by an arrangement in relation to certain actions theretofore pending in *Virginia*, by *B* against *M*; and for the purpose of inducing the jury to believe such arrangement, proved that *M* had cut upon the premises devised to him by *B's* father, wood to the value of $2000. Such proof being offered without objection, *M*, to rebut it, *proposed to prove* that the rented property was greatly improved by him by his course of farming. HELD: that this testimony was not admissible as an answer to the alleged trespass.

Whether the land had been well tilled or not, or had been cultivated so as to benefit the defendant, were not questions in issue before the jury.

A lessee cannot set up any claim for voluntarily farming land in a more beneficial manner than the lease required.

When a tenant has been guilty of a trespass in committing waste upon the demised premises, evidence of better than ordinary cultivation of the same cannot have any tendency to diminish or mitigate a claim for damages for such waste.

When a party offered to read a commission to take testimony and the proceedings under it, to the jury, and his opponent objected to all such parts of it as went to establish a particular fact; and the county court permitted all of the depositions to be read, to which the defendant excepted, this court will not consider that tribunal as deciding any other question than the specific one raised.

It was the duty of the county court, as no other objection was taken than the one above adverted to, to permit the residue of the evidence to be read to the jury.

It is not the duty of the court to point out objections to the admissibility of proof.

Since the act of 1825, ch. 117, no point can be insisted upon, by the appellant, which was not raised by the court below; and this court cannot act on a

question which shall not appear to have been presented to the county court.

It is a fatal objection to a prayer, that facts are assumed in it which should be submitted to the jury.

Where the nature of an enquiry before arbitrators, was such as to render notice of their intended action necessary, a prayer founded upon the supposed sufficiency of their award, in an action upon it, which is silent upon the question of notice, and claims that the plaintiff is entitled to recover upon the award, irrespective of notice, though there was evidence of it, ought not to be granted.

Where, from the nature of a submission, the judgment of arbitrators may be influenced or enlightened by the adduction of evidence, the parties are entitled to notice of the time and place of their proceeding to investigate the matters submitted to them.

Where, by an agreement to rent a fishery, the tenant had the privilege of getting timber out of the lands of his landlord for the purpose of erecting buildings which, when erected, were to be the property of the landlord, so far as his timber was used, and the tenant was to be at liberty to remove the materials he might supply, so far as it could be done without injury to the landlord's interest; an agreement was subsequently made to purchase *M's* materials, and refer the value of them to arbitrators, who, without notice to the parties, proceeded to make an award. HELD: that under such circumstances it was an open question of fact, whether matters had not been awarded upon, which had not been submitted.

Where matters not submitted are included in an award, which cannot be separated from the matters referred, the award is void, unless what had been done by the arbitrators has been subsequently ratified by the parties to be affected by their act.

An agent appointed to submit a claim to arbitration is not thereby authorized to ratify and confirm the award when made.

When the design of one party was to purchase, and the other to sell, materials, which, by the terms of a lease, the latter had a right to remove at the end of his term, and an agreement in relation to such purchase was submitted to arbitrators, if purchase money is to be paid, it should appear what were the articles appraised, so that the vendee might obtain title; and where some of the articles were particularized, and some were not, but were included under an *et cetera,* the award is uncertain and void.

All questions necessarily raised by a prayer in the county court, we must presume were brought to the attention of that tribunal.

APPEAL from *Baltimore* county court.

This was an action of *assumpsit,* commenced on the 3rd September 1842, by the appellee against the appellant.

The plaintiff declared for work done, materials found, goods sold, for money had, and upon an *insimul computasset.*

The defendant pleaded *non assumpsit*, on which issue was joined.

1st EXCEPTION. The plaintiff to support the issue on his part, offered in evidence the following depositions, viz:

1. That of *George Moore*, taken for the plaintiff under the act of 1828, who deposed, that he had knowledge of the fishing shore called *Possum Nose*, rented by *Andrew Musgrave* from *Thomas James Bullitt;* that he does not know whether there were any improvements on said fishery before said *M.* went there, and does not know what improvements said *M.* put thereon; that witness came on from home, which is at *Havre de Grace*, having work to do on the *Potomac*, some time in October or November 1841; that at that time witness and *Sellman*, and *Crook* were in partnership, which was not then dissolved, and they then had it in contemplation to rent the *Possum Nose* fishery. Witness asked *Mr. Sellman* whether he had executed a lease with *Mr. Bullitt*, the defendant, or not, he stated that he had not; that he had seen the lease of old *Mr. B.* to *A. M.*, which gave *M.* the power to remove all the buildings and improvements put on said fishery by said *M.*, and as witness was going on, he authorised the witness to say to *Mr. B.*, the defendant, unless he, said *B.*, would purchase the improvement, or suffer them, (the witness and *Sellman*, and *Crook*,) to purchase them and retain out of the rent, they would have nothing to do with the shore. On the 9th of December then next following, as witness thinks, or thereabouts, it was however on the day the arbitration took place, witness called at *Mrs. Murdoch's*, at *Dumfries*, where *Mr. B.*, the defendant, was at the time, and repeated to *Mr. B.* the said conversation which had taken place between the witness and *Sellman*. *Mr. B.* stated that he had sued *M.* for a trespass, and that said *M.* owed him some rent, consequently they did not speak; that he, said *B.*, authorised the witness to go and buy the property of *M.*, put up by said *M.* on the *Possum Nose*, as low as witness could, and in case witness and *M.* could not agree, to leave it to two men, and if they could not agree, to call in a third person, as to the price, and that whatever they agreed, he, said *B.*, would pay it; but, said he, recollect that whenever my

claim for damages, and I expect to recover a good deal, and rent is settled, whatever remains I will pay it. Witness went down on the shore the same morning and saw *Mr. M.* and stated distinctly to *M.* the conversation which witness had had with *B. Mr. M.* said, "I am perfectly satisfied to leave it to men, but I have done him no damage; I owe him some rent, which I have been always ready to pay him, but he distrained on my property before it was due." Witness and *Mr. M.* went down to the fishery, and *Mr. M.* asked $1500 for the improvements, and witness offered him $500. Witness then told *M.* that it was impossible for them to agree, and that he supposed they would have to leave it to men, and *M.* said that he was perfectly satisfied to do so; witness said that he was a stranger, and unacquainted with the men there, and wished to have a competent man on his side; that witness would like to have witness' partner at the fishery above, being the *Marsh* fishery, *Zebulon A. Kanky,* as one of the referees, but that he, said *M.,* might object to said *Kanky* on that ground, that he was witness' partner. Said *M.* stated that he considered *Mr. K.* a gentleman, and that he had no objections to him, and that he, said *M.,* would choose *Mr. Anness.* Witness and *M.* then both agreed, if the referees should not agree, to call in a third person, and whatever their decision might be, to abide by it. The referees, *Kanky* and *Anness,* did not agree, and they called in *Cockerill,* and the paper herewith filed and marked "Exhibit A," is the arbitration which the said three referees *K. A.* and *C.* signed; that the said paper marked Exhibit A, was prepared under the authority of *Mr. B,* the defendant, and unless it had been prepared, witness and *Sellman & Crook* would not have rented said *P N.* fishery. *Sellman & Crook,* witness being a silent partner with them, rented at the annual rent of $850, the *P. N.* fishery, *Stony Point* fishery and *Timber Branch* fishery, but only worked the *P. N.* fishery. Witness considers the rent very reasonable with the improvements, but would not have the *Possum Nose* fishery for one year for nothing, if the improvements mentioned in the arbitration had not been there. The other two fisheries, *Stony Point* and *Timber Branch,* witness considers as worth nothing in any

case. After the conversation between *M.* and witness, *M.* took witness over the improvements on *P. N.* fishery, and put witness into possession, and said to him, "mind, this is your property. I deliver it all over to you, and if it burns down, it is at your risk." Witness considered, that in receiving this property from *Mr. M.*, he took charge of it under the authority he derived from *Mr. B.* That he purchased the said improvements for *Mr. B.*, and not for *S. & C.* and himself; that witness signed the agreement endorsed on Exhibit A, and that in signing said agreement as *George Moore & Company*, he considered himself as acting as the agent of *Mr. B.*, the defendant; that witness, when he went down to *P. N.* fishery, offered *Mr. M.* $500 for the improvements, but, on account of the snow, was unable to ascertain their extent and value; that afterwards, when he came to know them fully, he considered the value put on them by the arbitrators as low enough. *Mr. B.* was on the ground on the day of the arbitration, but witness does not know whether he talked to the arbitrators, or went over the buildings and improvements. That witness has heard the deposition of *Nicholas Suter* in this cause, and that all the improvements mentioned in said deposition, by said *Nicholas Suter*, existed when witness went to *Possum Nose* fishery, and the other places, as he has above mentioned; that a high freshet in 1842, carried away sixty feet of the shed at *Possum Nose*, which witness saw there when *Sellman & Crook* took possession of the shore, and which, in consequence, *Mr. Suter* could not have seen; that witness collected as many of the boards of the said sixty feet of shed as he could find, and put them away; that two of the houses are covered with shingles, with the exception of about three feet on one end of one of them.

2. *Nicholas Suter*, a witness for the plaintiff, also, proved various repairs and improvements put up on the *Possum Nose* fishery from 1835 to 1843, necessary to a fishery.

3. *John Rogers*, also a witness for the plaintiff, gave evidence of his improvements; and that in 1839, the buildings and improvements on *Possum Nose* fishery were complete, and the best on the river for a rented shore. Witness has followed the fishing business nearly twenty-four years, and the

improvements, in his opinion, would be worth full two years rent of the unimproved property. During the space between 1836 and 1839, the whole character and condition of the shore aforesaid, was much improved by *Mr. Musgrave*, so as to increase its value as a fishing property. While witness was there, he did not observe any wood-cutting going on; did not see any wood carried off. A field or two near the shore was enclosed with pine poles, barely enough for a fence.

4. *Henry Moore*, a witness for plaintiff, also proved similar facts.

5. *Thomas M. Davidson* also proved, that he never had any conversation with *Mr. Bullitt* relating to said shore, but was present at a conversation between said *Bullitt*, the defendant, and said *Musgrave*, the plaintiff, about the paying for the improvements on said shore. It was about one year ago, either in last February or last March. Witness and *Mr. Musgrave* were going down *Pratt* street together, and they stopped into *Mr. Lutts'* hotel; they went in, and *Mr. Bullitt* was sitting there behind the stove. *Mr. Musgrave* went up to him and slapped him on the shoulder, and asked him how he was. Some little conversation took place between them, and at last *Mr. Musgrave* said to him, "I think it very hard *Mr. Bullitt*, that I cannot get paid for my property." *Mr. Bullitt* replied, that their lease would expire in about two years; he then began to talk about *Mr. George Moore's* fishing the place, and the character of the place. *Mr. Musgrave* said again, that he thought it very hard that he could not get paid for his property, and *Mr. Bullitt* said, "you must and shall be paid for your property," and told *Mr. Musgrave* that his property was still there. The conversation all this time was concerning the said fishery.

The exhibit marked A, referred to in the aforegoing depositions, is as follows, to wit:

Report of Mr. Wm. Cockrill, Richard Anniss and Z. A. Kanky, as regards the property on *Opossum Nose* fishery.

We agree, that *Mr. Andrew Musgrave* should receive the sum of $1000 for the following property, to wit: The houses, sheds, with all the apparatus thereto affixed with nails, also all

loose plank, oven, &c. Capstan, platform and gallows, and repairs on *Stony Point* shore, with repairs on wagon house.

*November* 29th 1841.                    Wm. Cockrill,
                                       Richard Anniss,
                                       Z. A. Kanky.

*(Endorsed.)* We, *Andrew Musgrave* and *George Moore & Co.*, do agree to abide by the within appraisement, as witness our hands and seals, this 29th November 1841.

                                       Andrew Musgrave,
                                       Geo. Moore & Co.

*John P. Phillips*, for the defendant, testified, that he was counsel for *Alexander C. Bullitt* in two cases of attachment or distress for rent, in the county court of *Prince William*, against *Andrew Musgrave*, and was also counsel for said *Bullitt* in three actions of covenant in the circuit superior court of law and chancery of *Prince William* county, and in an action on the case in the same court; all of the said cases were in the name of said *Bullitt*, in his own right, or as administrator of the late *Thomas J. Bullitt*, of *Maryland*, and involved questions under two leases, made by the said *Thomas J. Bullitt*, in his life time, to said *Andrew Musgrave*, &c. The papers in the said cases in the county and superior court, will shew the objects of each suit, better than I can explain them here. At the May term of the circuit superior court of law and chancery for *Prince William* county, 1842, *Alexander C. Bullitt* was in attendance upon that court, and he did authorise me to compromise and settle his differences with said *Musgrave*, arising under the said leases. I did converse with said *Musgrave* at the time of the term of the court aforesaid, on the subject of his controversies with said *Bullitt*, with a view to carry out a compromise between them, which I understood said *Musgrave* to be anxious to effect. The terms of the compromise, as I understood it, was, that the said *Bullitt* should dismiss all his suits against said *Musgrave*, except one, and take a judgment on that one against said *Musgrave*, for the sum of $452.13, with interest from the first day of May 1842, and the costs of that suit; and that thereupon, all matters of difference between said *Bullitt* and said

*Musgrave*, arising upon said leases, were ended and settled. I certainly considered *Mr. Bullitt* and *Mr. Musgrave* as having by that compromise, settled all differences between them arising upon said leases. I do not now recollect that I heard of any other matters between them, except some small accounts for money, rent, &c., which were included in the settlement. I understood the parties as being desirous to settle all their differences, and I have no doubt that was the understanding of both parties at the time. I certainly should not have advised *Mr. Bullitt* to dismiss his suits against *Mr. Musgrave*, and leave *Musgrave* at liberty to set up any claim he might make against *Bullitt*. After the compromise was agreed upon, and before judgment was entered up, *Musgrave* paid to *Bullitt* the sum of $300 in cash, and the judgment was entered up for the residue of said sum, being $152.13, with interest and costs as aforesaid. In the conversations on the subject of the compromise, the claims of said *Musgrave* under the lease for the fishery shore, were alluded to; he set up in those conversations, all his claims, as I understood him, under the lease. I recollect the plank, &c., which, under the lease, he was to have a right to remove, were alluded to. I considered, and as already stated, I believe *Mr. Musgrave* considered the compromise as a full settlement of all his demands against *Bullitt*, and all *Bullitt's* demands against him under said lease. I do not know the character of *Mr. Musgrave's* suit against *Mr. Bullitt*, and therefore cannot say that I know any thing further, which would be of any service to the parties.

*Joseph S. Farrow* also proved, that during the May term of the circuit superior court of law and chancery of *Prince William* county, in 1842, and after *Musgrave* and *Bullitt* had compromised their differences, I heard *Musgrave* say that they, the said *Musgrave* and *Bullitt*, had settled their affairs or business, and that he was glad of it; that he had to pay several hundred dollars, some three or five hundred dollars, and further said deponent saith not.

*Washington S. Norville* also proved that he was at the May term of the superior court of *Prince William* county in 1842, in company with the plaintiff, *Musgrave*, who desired me to

endeavor to bring about a compromise of the several suits pending between the plaintiff and defendant, for damages for cutting wood and for rent; the said plaintiff authorized me to propose to the defendant, that if he would dismiss his suits for damages for cutting wood, he, the said defendant, might take judgment for his rent, and it should end their legal controversies in *Virginia,* and fully discharge all claims and demands of every nature whatever, which the plaintiff had against the defendant under dealings in *Virginia.* I was not present when any conversation took place between the plaintiff and *John P. Philips,* nor was I present when the final arrangement was made between the parties as to their differences above referred to. I heard the plaintiff say, on the day of the compromise, that he would sue the defendant in *Baltimore,* and I am under the impression that he made this declaration before the compromise was made. I never heard the plaintiff say any thing about such a suit afterwards. Acting as a constable of *Prince William* county, I received an attachment issued by a magistrate of said county, a copy of which, marked A, is hereunto annexed as a part of this answer; under which, on the date of said warrant, I went upon the premises leased by *Bullitt* to *Musgrave,* and seized the property mentioned in my return thereon, but did not remove it; it was suffered to remain in the care of *Musgrave's* manager, and three days afterwards was surrendered, upon *Musgrave* suing out a writ of replevin. I heard *Bullitt* say he was afraid *Musgrave* would remove the property before the rent became due, but any declaration as to his intentions against *Musgrave,* further than to make his rent, I did not hear. I have been on the premises, assisted by a gentleman, *Mr. Henry Chapman,* measured the plank claimed by the plaintiff, and find, by calculation, to amount to about fifteen thousand feet, and do think it worth, at the expiration of the lease, not more than fifty cents per hundred feet; that it is now in rapid state of decay. At the request of the defendant, I have been over the land embraced in the lease, to ascertain as near by judgment, the quantity of wood cut from the land; I judge about one thousand cords; was worth at the time to defendant one dollar per cord, standing, it being near the river banks. I

think the wood was worth, at that time, one thousand dollars; the fence made by *Musgrave,* was of poles. I think that a large portion of wood carried away would have made rails; could have been applied to farming purposes. I further state, that at the time I levied warrants of distraint and attachment, the said plaintiff acknowledged that he was indebted to *Bullitt* after crediting some orders drawn on the plaintiff, which said *Bullitt* directed to allow if he paid the remainder of the rent. At the time of the compromise, the only item in dispute was the suit for the trespass on terms of the lease, and damages for breach of covenant. I think the fishing shore occupied by *Musgrave,* when rented, if it had been put up to the highest bidder, would have rented for $1000 or $1200.

And also the following leases :

Memorandum of an agreement made and entered into this 16th August 1836, between *Thomas J. Bullitt* of the one part, and *Andrew Musgrave* of the other part. The said *B.* agrees to let and demise, and doth hereby let and demise, unto the said *M.,* the fishing shore of the said *B.,* on the *Potomac* river, commonly called the *Possum Nose* fishery, for the term of four years, to commence on the 1st day of January 1838. In consideration whereof, the said *Musgrave* doth hereby agree with, and bind himself to the said *B.,* to pay him, the said *B.,* the annual rent of $500, at the following periods, that is to say, on the 1st day of July in each year during the said term. This fishery is to extend down the river to the four acres of land devised by the father of the said *B.* to his sisters, and laid off by the said *B.* for his sisters and their heirs, and no further, and is to extend up the river so far as not, in any manner, to obstruct or interfere with the *Timber Branch* fishery, and no further, it being the intention that the *Timber Branch* fishery shall be and remain free and clear from any obstruction or interruption whatever. The said *M.* has the privilege of getting timber out of the woods of the said *B.,* for the purpose of erecting buildings for the accommodation of the said *Possum Nose* fishery, which, when erected, are to be the entire property of said *B.,* so far as his timber is used, and to be carefully preserved for the time. The said *B.* is to be at no other expense whatever.

"The said *M.* is at liberty to remove such materials *as he may supply* towards the buildings, other than those from the woods of the said *B.*, so far as it can be done without exposure of, or injury to, the materials towards the said buildings attained out of the woods of the said *B.* The said *Musgrave* is to deliver up the said demised premises at the end of the said term to the said *Bullitt*, his heirs or assigns, peaceably and promptly.

In witness whereof, the said parties have hereto set their hands and seals.           Thos. J. Bullitt,   (Seal.)
                      Andrew Musgrave, (Seal.)

Memorandum of an agreement made and entered into, on this 8th day of September 1836, between *Thomas James Bullitt*, and *Andrew Musgrave* and *John H. Williams*, of *Prince William* county, in the State of *Virginia*, of the other part. The said *Bullitt* agrees to let and demise unto the said *Musgrave* and the said *Williams*, for and during the term of five years, to commence on the 1st day of January next, a parcel of land, belonging to the said *Bullitt*, lying and being in *Prince William* county, in the State of *Virginia*, in a neck between the river *Potomac* and *Quantico* creek, that is to say, the arable and woodland only, contained within the following limits, with the exceptions hereinafter mentioned: Beginning, &c. All fisheries, and all land necessary for the full enjoyment and accommodation thereof, excepted, and the free passage of the tenants and agents of the said *Bullitt*, to and from the fisheries also excepted; it being the intention of these presents, that the said *Musgrave* and *Williams* are not, in any manner, to molest or interrupt the fisheries, the land needful for the enjoyment and accommodation thereof, or the free passage of the tenants and agents of the said *Bullitt*, to and from the same as heretofore. In consideration whereof, the said *Musgrave* and *Williams* do hereby agree with, and bind themselves to the said *Bullitt*, for the annual rent or sum of money following: that is to say, the sum of $100, current money of the *United States*, on the last day of December, in the year of our Lord, 1837, and the rent or sum of $200, like money, on the last day of December in each and every year thereafter, during the said term. The said *Musgrave* and *Williams* are at liberty to

6      v.3

cut down, for the use of the demised premises; that is, for buildings, fences, fuel, and other purposes, all the second growth of wood and lumber, on the river adjoining the field now in the occupation of *Bell* and others, and being within the lines aforesaid, and to sell and dispose of, for their own benefit, the lapse of the timber cut down for rails and other wood that cannot be carefully applied to the purposes aforesaid, and otherwise would go to decay and be lost; but the original growth of wood and timber next to the creek, is to be preserved for the support of the demised premises, save only what may be necessary for the use of the farm, after the reasonable and discreet consumption of what is before permitted to be cut down. In case of failure of rail timber, within the lines aforesaid, during the said term, after the discreet consumption thereof, the said *Musgrave* and *Williams* are at liberty to procure rail timber for the use of the said farm out of the other woods of the said *Bullitt.* Signed," &c.

The defendant also proved, that *M.,* between 1838 and the spring of 1841, cut and sold wood off of said land, to a value amounting from $2000 to $2750; the plaintiff proved that such cutting was known to the agent of *T. J. B.,* in his, B's life time, and to the defendant, after said *Thomas'* death.

The plaintiff then offered in evidence the following depositions, taken under a commission, viz:

The deposition of *John W. Tyler* stated, that he knew of several suits between the parties, to wit: Two attachments and four other suits. Two of the latter suits were brought against *A. Musgrave* and *Jno. W. Williams,* one by *Alex. C. Bullitt,* in his own right, and the other as representative of *Thos. J. Bullitt;* the third was an action to recover $100, claimed to be due the estate of *Thos. J. Bullitt,* from *A. Musgrave,* and the fourth was brought by *Alex. C. Bullitt,* to recover a rent of $500. That he was the attorney of *A. Musgrave,* in the suits alluded to in his previous answer, and the defence made to one of the attachments was, that the attachment was defective, which was sustained by the court, and the attachment was quashed. The defence to the other was, that the amount claimed had been paid, and there was in the progress of the cause a judg-

Bullitt vs. Musgrave.—1845.

ment in *Musgrave's* favor for costs. Deponent says, that he does not recollect particularly the courts at which the attachments were ended. The other suits spoken of were in the circuit superior court of law and chancery for *Prince William*, and were settled, as deponent believes, at the May term 1842, of said court, under the following circumstances: During the court, there were some general propositions for compromise, and having been informed by *A. Musgrave* that the suits for damages for cutting and carrying away wood, &c., was vexatious and frivolous, and that he had a receipt for the $100 claimed in another suit, and that he owed the rent, subject to some offsetts; there was a proposition made to take judgment given for the rent, if the plaintiff would dismiss the other suits. This proposition was not acceded to, and there seemed to be no probability of a compromise. When the cases were called in their order on the docket, the judge of the court refused to set in the cases, on the score of his being a relative of the plaintiff, and directed them to be sent to another judicial circuit. After it was ascertained that no judgment could be had for the rent during that term of the court, and that increased trouble and expense would be incurred by the removal of the causes, the proposition for compromise was renewed, and it was finally agreed that judgment was to be given for the rent claimed, subject to offsetts agreed on by the parties, amounting to a small sum, and that the other three cases were to be dismissed; agreed, which was accordingly done. The deponent cannot tell the motives or inducements to the settlement, further than his answer may disclose. The deponent says, that he knows of no agreement, contract or promise, on the part of said *Musgrave*, to abandon any action or cause of action in *Baltimore*, or elsewhere, that he had against said *Bullitt*, in consideration of *Bullitt's* dismissing the suits aforesaid, in *Virginia*. The deponent says that he was the attorney of said *Musgrave*, and certainly never heard of any terms or conditions as mentioned in the foregoing interrogatories, and thinks that a client would usually mention such matters to his counsel if they existed.

The deponent says, that the copies from the order book of the court, marked A and B, and hereto annexed and certified by the clerk, shews the terms of the settlement as deponent understood it.    The judgment for $152.13, with interest from 1st May 1842, being the balance of rent of $500, after paying down the sum of $300 in money, or thereabouts, and allowing the offsetts.    The deponent says, that *A. Musgrave* conferred with him both before and after the compromise, as · to bringing suits for damages against *A. C. Bullitt*, and also as to the expediency of suing him in *Maryland* or in *Virginia*, and finally concluded, as a matter of convenience to himself, to bring the suits in *Baltimore, Md.*, and further this deponent saith not.

A—VIRGINIA.    At a circuit superior court of law and chancery, of *Prince William* county, held on the 19th day of May 1842.

*Alexander C. Bullitt*, plaintiff, *against Andrew Musgrave*, defendant.    In covenant.    This day came the plaintiff, by his attorney, and the defendant, by *John W. Tyler, Esq.*, his attorney, acknowledges the plaintiff's action, and agreed that the plaintiff has sustained damages in this case to the sum of $152.13, with legal interest thereon from the 1st day of May 1842, till payment.    Therefore it is considered by the court, that the plaintiff recover against the defendant, his damages acknowledged as aforesaid, and his costs, by him about his suit, in this behalf expended; and the said defendant in mercy, &c.

B.—*A. C. Bullitt*, plaintiff, *against A. Musgrave*, defendant.    *T. J. Bullitt's* adm'r, pl'ff, *against* same def't.    In covenant.    Same plaintiff *against* same defendant.    In case.

These causes are dismissed, being agreed between the parties.

The foregoing are true transcripts from the records of the circuit superior court of law and chancery, of *Prince William* county, in the State of *Virginia*.    In testimony whereof, I have hereto set my hand, this 8th day of August 1843.

P. D. LIPSCOMB, Cl'k.

*Daniel Ratcliffe* deposed, that he concurred in the statements of *John W. Tyler;* and that he was present at a conversation between *A. C. B.* and *A. M.*, in the town of *Dumfries*, touching

their differences in *Virginia*, and endeavored to effect a settlement of the same, but failed. The difficulty seemed to arise out of matters of account, and I heard nothing said about damages for trespass committed by *Musgrave*. I have lived for the last six or eight years within four miles of the farm and fishery rented by *Mr. Musgrave* of *Mr. Bullitt*, and have had frequent opportunities of observing the manner in which the same was managed, and hesitate not to say that I was surprised when I heard that *Mr. Bullitt* had instituted proceedings against *Mr. Musgrave* for damages on account of trespass committed by him. When *Mr. Musgrave* took the property alluded to, it was of little value comparatively, and when he left, it possessed as much character as any of a similar description in this whole section of country, and in my estimation, this change is ascribable in a great measure, to *Mr. Musgrave's* judicious and prudent management. The conversation above alluded to, took place prior to the middle of May 1842, and subsequent to the valuation of *Musgrave's* property on *Bullitt's* fishery by *Richard Anniss*, *Z. A. Kanky* and *William Cockrill, Esq.*

*James Lee* also proved, that *Musgrave* improved the rented farm; knew of trespass, and seizure under distress by rent. Other proof was offered of the improvement of the rented premises.

Papers referred to in the aforegoing depositions.

C.—A writ of *replevin*, *Musgrave vs. Bullitt*, issued 8th May 1841.

D.—Affidavit for an attachment by *B.* against *M.*, for rent due *B's* father, 6th May 1841. Return attached, and quashed.

The plaintiff offered to read the depositions, but the defendant objected to all such parts thereof as went to shew, that *Musgrave*, by his farming of said land, benefitted it for the defendant or his father. The court, (PURVIANCE, A. J.,) permitted all of said depositions to be read to the jury. The defendant excepted.

2ND EXCEPTION. The plaintiff and defendant having given in evidence the testimony stated in the foregoing exception, which it is agreed shall form part of this exception, the plaintiff offered the following prayer.

"That if the jury believe the evidence of the plaintiff's witness, *George Moore,* in relation to the agreement of reference, executed by the plaintiff and *George Moore & Co.,* dated 29th November 1841, and the report and award made under said reference, also dated 29th November 1841; and if they believe that said reference, and report and award was made, as stated by said witness *Moore,* that then the plaintiff is entitled to recover the amount of such award, unless the jury shall also find from the evidence in the case, that afterwards it was agreed by and between the plaintiff and defendant, that the amount so due to the plaintiff, in virtue of said reference and award, should be considered as compromised and released by the arrangement made in *Virginia,* in May 1842, mentioned in the evidence of the witness *John W. Tyler,* and the other witnesses testifying in regard to said arrangement, under the commission to *Virginia.*"

Which the court gave, and to which direction and opinion of the court, the defendant excepted.

The verdict and judgment being for the plaintiff below, the defendant there prosecuted this appeal.

The cause was argued before ARCHER, C. J., DORSEY and MARTIN, J.

By McMAHON and GLENN for the appellants, and
By REVERDY JOHNSON for the appellees.

ARCHER, C. J., delivered the opinion of this court.

The exceptions in this case are on the part of the defendant. The first has reference to the admissibility of evidence.

The plaintiff offered to read in evidence a commission returned on the 22nd of August 1843; but the defendant objected to all such parts of it as went to show that *Musgrave,* by his farming of the land leased by the defendant's father to him, benefitted it for the defendant, or his father. By the depositions of several witnesses taken under this commission, it was proved, that the farming of the land had been so conducted as to benefit the defendant. This constituted the portion of the evidence sought to be excluded.

Bullitt *vs.* Musgrave.—1845.

The action was in *assumpsit*, and was brought to recover the amount of an award, signed by arbitrators on the 29th of November 1841: the defence to this action consisted of evidence offered on the part of the defendant, to show that the claim on the award was compromised and released by an agreement, entered into between the parties in *Virginia*, in May 1842. And the defendant, for the purpose of inducing the jury to believe that such arrangement as was insisted upon by him had been made, offered proof, without objection, that the plaintiff had cut upon the demised premises between 1838 and the spring of 1841, and sold off the premises wood to the value of from $2000 to $2750. The defendant deemed the proof of a claim to damages for trespass, in cutting the wood to so great an amount as $2000 or $2700, as important to show that it was improbable claims to such an extent, over and beyond his claims for rent, would be compromised for so inconsiderable a sum as that for which judgment had been entered. Whether this evidence was admissible or not, we are not called upon to determine; but the evidence objected to is wholly inadmissible, unless upon some ground it could be considered as an answer to the alleged trespass in cutting the wood: for whether the land had been well tilled or not, or had been cultivated so as to benefit the defendant, were not questions in issue before the jury. No claim could be set up by the lessee for voluntarily farming the land in a more beneficial manner than the lease required. Nor could the evidence, upon any view of it, be considered as furnishing any answer to the alleged trespass. It could not have any tendency to diminish, or mitigate the damages. We, therefore, think the testimony objected to was wholly inadmissible, and that it should, consequently have been rejected by the court.

It has been urged by the appellant, that the court below not only decided the evidence objected to by him, to be admissible, but that all the evidence taken under the commission was admissible, and proceeding on this assumption, various objections have been urged to different portions of the evidence. But we have not considered the court below as deciding any other question than the specific question raised, and which we have

examined.    The court, it is true, did permit the whole of the evidence to be read to the jury, after disposing of the particular objection raised, and this it was their duty to do, as no other objection was taken than that which has been adverted to.    It was not the duty of the court to point out objections to the admissibility of other portions of the evidence taken under the commission, but they might well await the action of the complainant in relation thereto, and if no other objection was urged, the court only performed their duty, in allowing the commission, and the evidence taken under it, to have been read to the jury.    Since the act of 1825, ch. 117, no point can be insisted upon by the appellant which was not raised in the court below, and we cannot act on a question which shall not appear to have been presented to the county court.    Believing the only point decided by the county court, to have been the question raised on the particular evidence objected to, we cannot entertain the appeal in relation to the objections urged to other portions of the evidence, taken under the commission.

The plaintiff, in the second bill of exceptions, prayed the court's opinion to the jury, that if the jury believe the evidence of the plaintiff's witness, *George Moore*, in relation to the agreement of reference, also given in evidence, and executed by the plaintiff, and  *George Moore & Co.*, dated 29th Nov. 1841; and the report and award made under said reference, also dated 29th Nov. 1841; and if they believe the said reference and report, and award was made, as stated by the said witness, *Moore*, that then the plaintiff is entitled to recover the amount of such award, unless the jury shall also find from the evidence in the case, that afterwards it was agreed by, and between the plaintiff and defendant, that the amount so due to the plaintiffs, in virtue of said reference and award, should be considered as compromised, and released by the arrangement made in *Virginia* in May 1842, mentioned in the evidence of the witness, *Jno. W. Tyler*, and the other witnesses, testifying in regard to said arrangement, under the commission to *Virginia*.

There are fatal objections to the instruction prayed.    Facts are assumed which should have been submitted to the jury. Thus, the question of notice, was a fact to be found by the

jury. There was abundant evidence to show notice; but the prayer is not put on the hypothesis of notice, and no matter what the jury might believe on the subject of notice, they would have been bound by the instruction granted, to have found for the plaintiff, if they believed the evidence of *Moore,* in relation to the reference, report, and award, provided they further believed that no compromise had been made, as mentioned in the instruction.

The nature of the enquiry by the arbitrators, was such as to render notice necessary. By the agreement between the parties, of the 16th of August 1836, *Musgrave* had liberty to remove such materials as he might supply towards the buildings, other than those from the woods of *Bullitt,* so far as it could be done without exposure of, or injury to the materials towards the said buildings, obtained out of the woods of the said *Bullitt.* It was the purchase of these materials by the one, and the sale by the other, which was the object of the reference. Had notice been given, it is fair to presume, that evidence might have been adduced, to show that injury might arise from the removal of some of the materials furnished, within the meaning and terms of the contract. At all events, the judgment of the arbitrators might have been influenced or enlightened, by the adduction of evidence on the part of the defendant.

It was, moreover, a question of fact to be determined by the jury, whether matters had not been awarded upon, which had not been submitted by the parties, for, if such matters had been included in the award, which could not be separated from the matters referred, the award would be inoperative and void, unless indeed what had been done by the arbitrators, had afterwards been ratified by the party, to be affected by such award.

There was evidence that buildings had been erected on *Stony Point* by *Musgrave,* and the award finds for repairs on the *Stony Point* shore.

The reference agreed upon was to value the property on the *Opossum Nose Fishery* only; and if repairs were valued, which had been put up on *Stony Point Fishery,* such repairs were not within the submission. It is true this enquiry would be

7    v.3

immaterial, if, after the appraisement had been made, the defendant had ratified the same. But the instruction does not require the jury to enquire into the fact, whether there had been a subsequent ratification of the award, in case of any excess; but the jury are instructed to find the amount of the award, if they believe the evidence of *Moore* in relation to the reference and award, and if they believe the reference, report, and award were made, as stated by *Moore*. Now this instruction is silent as to any evidence in relation to the endorsement on the award signed by *Musgrave* and *Moore & Co.;* and if that had been put to the jury, on their belief of the evidence of *Moore* on that subject, still it would not follow, that the jury must find the amount of the award for the plaintiff, for *Moore* does not prove any communication with *Bullitt* in relation to such ratification, or that any power was imparted to him otherwise than by the original power. He does not directly prove his authority, but only states that, what he did, he considered he was doing, as agent of *Bullitt*, the defendant. It was but his opinion, which to besure, had been admitted as evidence to the jury, without objection; and if the jury had believed he had truly stated his belief, it still was not imperative upon them as to the fact, whether authority had been imparted to him by *Bullitt* to ratify the award.

But in addition to the above objections to the instruction given by the court below, there is another which, to our minds, is conclusive. The award is wholly uncertain, and therefore void; and if all other objections were waived, it could not furnish the basis of the instruction granted. The design of *Bullitt* was to purchase, and *Musgrave*, to sell the materials, which, by the terms of the lease, the latter had the right to remove. If the sum awarded, the purchase money, is to be paid, it should sufficiently appear what were the articles appraised, so that the vendee might obtain a title. In this respect, we consider the award uncertain; certain articles are particularized, but some are not, but are included under an *et cetera.* These terms must mean something, but what, can only be left to conjecture. The parties ought not to be left to speculation; and we could not sanction an award so indefinite.

We consider these questions as all necessarily raised by the prayer offered, and must presume they were brought to the attention of the court below.

JUDGMENT REVERSED AND PROCEDENDO AWARDED.